J-S63032-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| v. | |
| JEROME BANKS | |
| Appellant | No. 2678 EDA 2015 |

Appeal from the PCRA Order August 24, 2015
in the Court of Common Pleas of Philadelphia County Criminal Division
at No(s): CP-51-CR-0008665-2007

BEFORE: FORD ELLIOTT, P.J.E., SHOGAN, J., and FITZGERALD,[*] J.

MEMORANDUM BY FITZGERALD, J.:                **FILED OCTOBER 19, 2016**

Appellant, Jerome Banks, appeals from the order entered in the Philadelphia County Court of Common Pleas, denying his first Post Conviction Relief Act[1] ("PCRA") petition without an evidentiary hearing. Appellant contends trial counsel was ineffective for failing to preserve a weight of the evidence claim. We affirm.

On Appellant's direct appeal *nunc pro tunc*, this Court summarized the relevant facts of Appellant's convictions for first-degree murder[2] and possessing an instrument of crime[3] ("PIC"):

---

[*] Former Justice specially assigned to the Superior Court.

[1] 42 Pa.C.S §§ 9541-9546.

[2] 18 Pa.C.S. § 2502(a).

[3] 18 Pa.C.S. § 907(a).

It is uncontroverted that [A]ppellant shot and killed the victim, Andre Johnson (the victim). Commonwealth witness Carl Martin, a security guard on his way home from work, testified that, on May 12, 2007, at approximately 11:15 PM, he was ascending the stairs to the eastbound SEPTA Market-Frankford elevated station (El) at 52nd and Market Street[s] in the City and County of Philadelphia, when he heard two males, later identified as [A]ppellant and the victim, facing each other arguing. When he reached the E[l] platform, Martin heard two or three gunshots, looked down from the El platform and observed [A]ppellant standing close to the victim with his arm outstretched, a gun in his hand. Appellant was saying, "You threatening me? You threatening me?" The victim appeared to be attempting to back away from [A]ppellant. A few minutes later, Martin heard an additional two shots and saw the victim fall to the ground. Just then, a police patrol car rode by traveling northbound on 52nd Street. As the patrol car drove by, [A]ppellant raised his arms in the air, stating "self defense, self defense." However, the patrol car did not stop. Appellant then walked to a nearby vehicle, got in, and drove away, traveling southbound on 52nd Street. Martin waited until the vehicle was gone, called 911, then came down from the El platform to check the victim. He observed two gunshot wounds on the victim, one to the right shoulder area and one to the stomach area. He searched the victim but did not find a weapon. Martin was taken to the Homicide Unit where he gave a statement consistent with his testimony.

Commonwealth witness Robert E. Johnson, Sr., testified that he got off the El at 52nd and Market Street[s] and walked down the up escalator onto the southwest corner of 52nd and Market. He observed two males, [A]ppellant who he identified in court, and the victim, who he knew from the area, holding a conversation. As he walked by, he heard the victim tell [A]ppellant, "So, I said, you know what, put a hit out on your butt." Appellant responded, "What, you still talking stuff." When Johnson was about twenty-five feet away, he heard three gunshots. He took cover, called 911 and looked back to see [A]ppellant facing west up Market Street. He heard two more shots, saw flashes from [A]ppellant's hand, and observed the victim,

who had been out of his view, fall to the ground. Johnson then watched as [A]ppellant raised his hands as a police patrol car drove by. When the patrol car drove away, Johnson observed [A]ppellant get into a minivan and drive away. He was able to give a description of the vehicle and the tag number to the 911 operator. Johnson gave a statement to [h]omicide [d]etectives.

Philadelphia Police Officers arrived at the scene at approximately 11:18 PM, to find the body of the victim, lying on the southwest corner of 52nd and Market Street[s], by the SEPTA elevated [escalator. Medics tried to revive the victim, but pronounced him] dead at the scene . . . . The medical examiner determined that the victim died of blood loss as a result of multiple gunshot wounds; a perforating gunshot wound to the chest that entered the right chest, traveled through the heart, the right lung, the aorta, and the left lung, then exited the left back, and a penetrating gunshot wound that traveled through the pelvis and into the left buttock where a bullet was retrieved. The bullet was turned over to the Firearms Identification Unit (FIU) for analysis.

Meanwhile, in response to a radio call that the shooter involved in the incident at 52nd and Market Street[s] wanted to surrender, Police Officer Hector Rodriguez of the 18th Police District went to the District Headquarters at 55th and Pine Streets where he found [A]ppellant in a burgundy minivan with the flashers on. As Officer Rodriguez removed [A]ppellant from the minivan and placed him in the police vehicle, [A]ppellant told Officer Rodriguez that he shot the victim, that it was self defense, that the victim put a hit out on him, and that they both were drunk. Appellant also told the Officer that his gun was in the vehicle, in the console between the two seats. A search of [A]ppellant's person recovered a pocket knife, a six-round speed loader loaded with six live .357 rounds and an ankle holster. Appellant was placed in a police vehicle and transported to the Homicide Unit.

After being **Mirandized**,[4] [A]ppellant gave Homicide Detective David Baker a statement indicating that he felt that his life was threatened because the victim told [A]ppellant that he had put a contract out on him. Appellant took the threat seriously. Appellant indicated that he lifted his shirt to show the victim that he was not carrying a gun and the victim became more aggressive. Appellant then retrieved his gun from the ankle holster and placed it in his pocket. The victim lunged at [A]ppellant and [A]ppellant shot him in his left leg then in his right leg. The victim made another step and called [A]ppellant a name. Appellant then shot the victim in his chest. He tried to get the attention of an officer who [rode] by in his patrol car, but when the officer did not stop, [A]ppellant decided to drive himself to the police station and called 911 to let the police know. He drove to 55th and Pine Streets and put his flashers on. Appellant stated that he did not see the victim with a weapon, but he was "reaching" as if he had one. Appellant did not retreat because he thought he had no reason to, and because he had a gun. Appellant's testimony at trial was substantially consistent with the statement he gave Detective Baker.

**Commonwealth v. Banks**, 2454 EDA 2011 (unpublished memorandum at 1-2) (Pa. Super. filed Jan. 29, 2013), *appeal denied*, 90 EAL 2013 (Pa. Aug. 29, 2013) (citation and internal footnotes omitted).

At trial, Appellant testified on direct examination that he was "hacking"[5] at the corner of 52nd and Market Streets in Philadelphia on March 12, 2007, at around 10:30 p.m., when he encountered the victim and struck up a conversation. N.T. Trial, 1/7/08, at 134-35, 137. The victim began

---

[4] **Miranda v. Arizona**, 384 U.S. 436 (1966).

[5] "Hacking" referred to Appellant's working as an unlicensed taxi driver. N.T. Trial, 1/7/08, at 130.

ranting to Appellant how people were in the victim's business, and how he

killed people for "contracts." *Id.* at 140-41. Appellant continued:

> [Appellant]. Okay. Just basically [the victim] finally had got to the point—after he was saying all this, he finally got to the point and said that he had put a contract out on me. And I said, Well, what did I do to you? He said, Don't worry about it.
>
> [Appellant's Trial Counsel[6]]. What was his tone of voice when he was saying that to you?
>
> A. Basically his expressions and his voice was high-pitched.
>
> Q. Did you feel threatened as a result of what he said to you?
>
> A. Basically, basically, when he first said that he had put a contract on me, I have to be honest, no, I did not believe him.
>
> But by me asking him and saying certain things, basically, I have to admit, I played along with him just to feel if it was the truth.
>
> Q. Okay. What did he say to you?
>
> A. When he said that he put a contract on me, I said, Yeah? He said that's what he do. He do contracts.
>
> I said, You do contracts? He said yeah. He said it's young boys who contracts. He said they're going to do the job for him.
>
> I said, Yeah, they going to do it for free? He said, Don't worry about that.

---

[6] Appellant was represented at trial by Douglas L. Dolfman, Esq. ("trial counsel").

He said—I said, Well, I don't know no young boys who do jobs for free.

I'm basically playing with him.

*   *   *

Q. All right.  Go on.  What happens next?

A. And while he's saying this in my face and by his facial expressions, tone of voice, and then he was spitting in my face, beings as though he had a missing tooth and I guess by he was drunk, as he was speaking, he was spitting in my face.

And that's when basically I started taking him serious. I had to ask him, I said, Dray, can you get out of my face? He kept on saying, yeah, well, yeah, something about to happen.  It's about to happen real soon.

Q. Was Dray his nickname?

A. Yes.

Q. Go on.

A. And when he kept going and I kept—I had told him. Basically I used the word.  I told him to get the "F" out of my face.  Then he just continued on.  He said yeah, yeah, he said, don't worry.  It's about to happen.

At the time he just stepped two steps away from me, and then when he said that, for me, that put my level of awareness up.  I have to look around.  I'm not looking at him anymore.  I'm letting him talk.  Now I'm looking around both sides because to me that's a sign of he's about to set me up.

Q. What did you see?

A. What did I see? I seen four or five gentlemen come up from my left, and when they came up from my left, I recognized them because these was the same gentlemen which a year ago had broke into my car.  . . .

> When he approached me, when they came up, I was aware of them. They had a hoodie on their head, they had a baseball cap, and they had a hand in their pocket.
>
> *    *    *
>
> A. So when I seen they approach, when they came and approached me, I knew basically it was like a setup. That's when I basically slipped from between Dray, and I literally went in the middle of the street. I said if they was going to try to make a move, I want everybody to see, traffic. So I literally ran in the street in between traffic.
>
> Q. Where did Dray go?
>
> A. Dray had backed up. That's when he backed up back to the corner . . . and the other gentlemen, I seen them approach, went up the steps, the escalator. But by that time, which when they approached, I reached down and grabbed my weapon.

*Id.* at 148-52. Appellant testified he removed his firearm from a holster on his left ankle and placed it in his pocket. *Id.* at 152-53. The victim saw Appellant and stated, "Yeah, here you go playing with guns. I'm not scared of no guns." *Id.* at 153.

The victim then approached Appellant, and Appellant fired two shots at the victim's leg. *Id.* at 154.

> [Trial Counsel]. When you fired the two shots at [the victim], where were his hands?
>
> A. Oh, his hands constantly stayed in his pocket, yes.
>
> *    *    *
>
> Q. Did you ever see a weapon on him?
>
> A. No.

*Id.* at 155-56. Appellant testified that after the two shots, the victim remained standing and "charged after" Appellant. *Id.* at 158. Appellant then shot the victim in the chest. *Id.* After attempting and failing to flag down a passing police car, Appellant called 911 and drove himself to the local police station. *Id.* at 159, 162. Appellant told the 911 dispatcher that he had shot the victim and still had his gun on him. *Id.* at 162-63.

Appellant went on to testify that he had a permit to carry his firearm:

[Trial counsel]. Did you have a permit to carry a gun?

A. Yes.

*        *        *

Q. Okay. And what did you state on [your permit] was your reason for wanting a permit or reason for getting it?

A. Basically I'm on disability as I speak of right now. I am a victim of a crime. My left arm is permanently damaged for the rest of my life. I lost all muscle. If they want to see my fingers, I have constant permanent nerve damage. I'm in pain 24/7. I suppose to be going to the pain clinic, but I stopped going to the pain clinic because I don't believe in taking medication.

Q. So what does it say on your permit for reason for getting it?

A. Self-defense.

*Id.* at 164-65.

On cross-examination, the Commonwealth questioned Appellant about his police statement, which the Commonwealth read into the record:

[Commonwealth]. I'm going to read it to you again.

- 8 -

>**Question**: When you first felt threatened by [the victim], why didn't you just walk away or call 9-1-1?
>
>**Answer**: I basically had no reason to run. I didn't do nothing to nobody, and I was protected by my gun. Really my mind told me that I shouldn't run because, if I ran, people would think that I wouldn't use my gun.

Did I read that accurately as it's typed there on that paper?

A. Yes, you is correct.

Q. Okay. And do you recall being asked that question by the Homicide detectives?

A. Yes, you is correct.

Q. And did you give them that answer as I just read it?

A. Yes, you is correct.

Q. So you told them that?

A. Yes, you is correct.

*Id.* at 238-39.

At the conclusion of trial, the court charged the jury on first-degree murder, third-degree murder, and voluntary manslaughter. The jury convicted Appellant of first-degree murder and possessing an instrument of crime ("PIC"). The court sentenced Appellant on March 28, 2008, to life imprisonment for murder, and a concurrent sentence of two and one-half to

five years' imprisonment for PIC. No timely post-sentence motions were apparently filed.[7]

On September 29, 2008, Appellant filed a *pro se* PCRA petition, in which he alleged ineffective assistance of trial counsel. After filing a second *pro se* petition, the court appointed Elayne Bryn, Esq. ("appointed counsel"), to represent Appellant. Appointed counsel subsequently filed two amended PCRA petitions and accompanying memoranda, which (1) alleged, *inter alia*, trial counsel was ineffective for failing to preserve a weight of the evidence claim and (2) requested reinstatement of Appellant's rights to file a post-sentence motion and direct appeal *nunc pro tunc*. Thereafter, on August 12, 2011, appointed counsel filed a motion to withdraw Appellant's request to file post-sentence motions *nunc pro tunc* citing this Court's decision in **Commonwealth v. Barnett**, 25 A.3d 371 (Pa. Super. 2011) (*en banc*).[8]

---

[7] Trial counsel sent Appellant a letter on May 30, 2008, informing him that a post-sentence motion had been filed on his behalf. Although a review of the record indicates a post-sentence motion and a request for appointment of appellate counsel were entered on the docket on April 18, 2008, the trial court informed Appellant on August 15, 2008, that no post-sentence motions were filed on his behalf. Furthermore, on June 11, 2008, this Court apparently granted Appellant's petition to withdraw an appeal, although the circumstances giving rise to that order are unclear from the record.

[8] **Barnett** concluded that ineffective assistance of counsel claims could not be raised on direct appeal absent a waiver of the defendant's PCRA rights. **Barnett**, 25 A.3d at 377. Our Supreme Court subsequently vacated that decision and remanded the case to the trial court for further proceedings in light of **Commonwealth v. Holmes**, 79 A.3d 562 (Pa. 2013). **See Commonwealth v. Barnett**, 84 A.3d 1060 (Pa. 2014).

Appellant also withdrew his claim regarding trial counsel's ineffectiveness for failing to challenge the weight of the evidence. The court permitted Appellant to withdraw his ineffectiveness claims, and granted him leave to file a notice of direct appeal *nunc pro tunc*.

Appellant filed a notice of appeal *nunc pro tunc* on September 7, 2011. This Court subsequently affirmed Appellant's judgment of sentence on January 29, 2013, holding that the evidence was sufficient to rebut his claim of self-defense and sustain the convictions. **Banks**, 2454 EDA 2011 at 10. Although Appellant also attempted to challenge the weight of the evidence, which the trial court addressed in its Pa.R.A.P. 1925(a) opinion, this Court found that claim was waived based on Appellant's failure to preserve it in a post-sentence motion. **See id.** at 11. Our Supreme Court denied allowance of appeal on August 29, 2013.

Appellant filed a *pro se* PCRA petition on September 26, 2013, and an amended *pro se* petition on October 15, 2013, both of which alleged ineffective assistance of trial counsel. The PCRA court appointed Dennis I. Turner, Esq. ("PCRA counsel"), who filed an amended petition on March 1, 2015, alleging, *inter alia*, trial counsel's ineffectiveness for failing to file a post-sentence motion challenging the weight of the evidence. The Commonwealth filed a motion to dismiss Appellant's petition, and on July 28, 2015, the PCRA court issued notice of its intent to dismiss Appellant's

petition without a hearing pursuant to Pa.R.Crim.P. 907.[9]  The PCRA court

subsequently dismissed Appellant's petition on August 24, 2015.  Appellant

timely filed a notice of appeal on August 31, 2015.  The PCRA court ordered

Appellant to file a Rule 1925(b) statement, and Appellant timely complied.

Appellant raises the following issue for our review:

> Whether the PCRA court violated paragraph (1) of Rule 907 of Pa.R.Crim.P. by summarily dismissing [Appellant's] PCRA petition without [an] evidentiary hearing, where there was a genuine issue of material fact as to whether trial counsel had a reasonable basis for failing to file a post trial motion to challenge the weight of the evidence in connection [with] "specific intent to kill", where [Appellant's] medical history of having previously been violently assaulted would have bolstered the credibility that [Appellant] believed it was necessary for him to use deadly force on that present occasion to protect himself from the use of unlawful deadly force against him by decedent, in support[] [of] his self defense claim?

Appellant's Brief at 5.

Appellant argues trial counsel was ineffective for failing to preserve a

weight of the evidence issue.  *Id.* at 13.  Appellant contends trial counsel

failed to present evidence of Appellant's medical history to support his self-

defense claim, which went to the weight of the evidence.  *Id.*  Specifically,

Appellant alleges his pre-sentence investigative report revealed he was

---

[9] Appellant responded *pro se* to the PCRA court's Rule 907 notice on August 17, 2015.  However, because PCRA counsel represented Appellant, his *pro se* Rule 907 response violated the policy precluding hybrid representation and could not be considered by the PCRA court.  *See Commonwealth v. Jette*, 23 A.3d 1032, 1036 (Pa. 2011).

stabbed and slashed with a box cutter in 2000, shot in the arm and side in 2001, and was involved in a serious car accident in 2002. *Id.* at 18-19. Appellant claims he suffers from post-traumatic stress disorder, substance abuse, and chronic pain syndrome because of these events and has received mental health treatment. *Id.* at 19.

Appellant also avers his history of being assaulted affected his perception of his encounter with the victim and is directly relevant to his self-defense claim or a possible reduction in the grade of the offense. *Id.* at 19-20. Appellant asserts the testimony of the Commonwealth's witnesses was consistent with Appellant's perception that the victim threatened him and caused him to fear for his life. *Id.* at 20. Appellant maintains trial counsel lacked a reasonable basis for failing to raise a weight claim in a post-sentence motion, and he suffered prejudice from trial counsel's inaction. *Id.* We conclude no relief is due.

"On appeal from the denial of PCRA relief, our standard and scope of review is limited to determining whether the PCRA court's findings are supported by the record and without legal error." *Commonwealth v. Abu-Jamal*, 941 A.2d 1263, 1267 (Pa. 2008) (citation omitted). "[A] PCRA petitioner is not automatically entitled to an evidentiary hearing. We review the PCRA court's decision dismissing a petition without a hearing for an abuse of discretion." *Commonwealth v. Miller*, 102 A.3d 988, 992 (Pa. Super. 2014) (citation omitted). Further, when the PCRA court denies relief

without an evidentiary hearing, this Court must examine each of the issues raised in light of the record to determine whether the PCRA court erred in concluding there were no genuine issues of material fact. *Id.* (citation omitted).

> [C]ounsel is presumed to have provided effective representation unless the PCRA petitioner pleads and proves that: (1) the underlying claim is of arguable merit; (2) counsel had no reasonable basis for his or her conduct; and (3) Appellant was prejudiced by counsel's action or omission. To demonstrate prejudice, an appellant must prove that a reasonable probability of acquittal existed but for the action or omission of trial counsel. A claim of ineffective assistance of counsel will fail if the petitioner does not meet any of the three prongs. Further, a PCRA petitioner must exhibit a concerted effort to develop his ineffectiveness claim and may not rely on boilerplate allegations of ineffectiveness.

*Commonwealth v. Perry*, 959 A.2d 932, 936 (Pa. Super. 2008) (quotation marks and citations omitted).

As to Appellant's claim that trial counsel was ineffective for failing to preserve a weight of the evidence claim,

> [i]t is well settled that the jury is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses, and a new trial based on a weight of the evidence claim is only warranted where the jury's verdict is so contrary to the evidence that it shocks one's sense of justice.

*Commonwealth v. Houser*, 18 A.3d 1128, 1135-36 (Pa. 2011) (citation omitted).

Rule 607 of the Pennsylvania Rules of Criminal Procedure states:

**Rule 607. Challenges to the Weight of the Evidence**

(A)   A claim that the verdict was against the weight of the evidence shall be raised with the trial judge in a motion for a new trial:

(1)   orally, on the record, at any time before sentencing;

(2)   by written motion at any time before sentencing; or

(3)   in a post-sentence motion.

Pa.R.Crim.P. 607(A).

"To sustain a conviction for murder of the first-degree, the Commonwealth must prove that: (1) a human being was unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with specific intent to kill." ***Commonwealth v. Rivera***, 983 A.2d 1211, 1220 (Pa. 2009) (citations omitted).  Murder requires proof of malice. ***Commonwealth v. Sepulveda***, 55 A.3d 1108, 1143 (Pa. 2012).  The use of deadly weapon upon a vital part of the body may establish the intent to kill and malice. ***Commonwealth v. Briggs***, 12 A.3d 291, 306 (Pa. 2011).

A claim of self-defense "tends to negate the malice required for murder" and the unlawfulness of the killing. ***Sepulveda***, 55 A.3d at 1143 (citation omitted).  Section 505 of the Crimes Code defines self-defense, in part, as follows:

**§ 505.  Use of force in self-protection**

**(a)   Use of force justifiable for protection of the person.—**The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting

- 15 -

himself against the use of unlawful force by such other person on the present occasion.

**(b) Limitations on justifying necessity for use of force.—**

\* \* \*

(2) The use of deadly force is not justifiable under this section unless the actor believes that such force is necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat; nor is it justifiable if:

(i) the actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter; or

(ii) the actor knows that he can avoid the necessity of using such force with complete safety by retreating, except the actor is not obliged to retreat from his dwelling or place of work, unless he was the initial aggressor or is assailed in his place of work by another person whose place of work the actor knows it to be.

18 Pa.C.S. § 505(a), (b)(2)(i)-(ii).

The Pennsylvania Supreme Court has observed,

When a defendant raises the issue of self-defense, the Commonwealth bears the burden to disprove such a defense beyond a reasonable doubt. While there is no burden on a defendant to prove the claim, before the defense is properly at issue at trial, there must be some evidence, from whatever source, to justify a finding of self-defense. If there is any evidence that will support the claim, then the issue is properly before the fact finder.

*Commonwealth v. Torres*, 766 A.2d 342, 345 (Pa. 2001) (citations omitted); *accord Commonwealth v. Mouzon*, 53 A.3d 738, 743 (Pa. 2012).

- 16 -

Additionally, Section 2503(b) of the Crimes Code states:

> A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify the killing under Chapter 5 of this title, but his belief is unreasonable.

18 Pa.C.S. § 2503(b). A claim of "imperfect self-defense" under Section 2503(b) is "imperfect in only one respect—an unreasonable rather than a reasonable belief that deadly force was required to save the actor's life. All other principles of justification under 18 Pa.C.S. § 505 must have been met. . . ." *Rivera*, 983 A.2d at 1225 (citation omitted). Thus, a defendant may not provoke or continue "the difficulty" that led to the slaying and then claim self-defense. *Mouzon*, 53 A.3d at 751. Similarly, a claim of justification or imperfect self-defense may be rebutted "where there is an avenue of retreat, if the defendant knows the avenue of retreat is available." *Commonwealth v. Ventura*, 975 A.2d 1128, 1143 (Pa. Super. 2009) (citation omitted).

At the outset, we note that Appellant's claim that **trial** counsel was ineffective for failing to file a post-sentence motion challenging the weight of the evidence is misplaced. **Appointed** counsel initially raised the issue of trial counsel's ineffectiveness and sought reinstatement of Appellant's rights to file a post-sentence motion and a direct appeal *nunc pro tunc*. However, appointed counsel withdrew Appellant's request to file post-sentence motions *nunc pro tunc* and proceeded to the direct appeal *nunc pro tunc*

- 17 -

without preserving Appellant's weight of the evidence claim. This Court subsequently found Appellant's weight of the evidence claim waived. ***See Banks***, 2454 EDA 2011 at 11; ***see also*** Pa.R.Crim.P. 607(A). Therefore, Appellant's claim of trial counsel's ineffectiveness for failing to file a post-sentence motion could have been addressed in the PCRA proceeding leading to his direct appeal *nunc pro tunc* and his instant claim should have been directed toward appointed counsel's failure to preserve the issue in the direct appeal *nunc pro tunc*. ***See*** 42 Pa.C.S. § 9544(b) ("an issue is waived if the petitioner could have raised it but failed to do so . . . during unitary review").

In any event, we agree with the PCRA court's determination that Appellant cannot show prejudice resulting from trial counsel's ineffectiveness with respect to his intended weight challenge. ***See*** PCRA Ct. Op., 11/20/15, at 5. Appellant testified on direct examination that he initially did not feel threatened because he believed the victim was lying about having a "contract" out to kill Appellant. N.T. Trial, 1/7/08, at 148-49. Nevertheless, Appellant continued to engage in a conversation with the victim about the "contract" until he began to get in Appellant's face. ***Id.*** at 149-51. Upon seeing several young men walking toward them, Appellant backed up into the street and placed his firearm in his pocket. ***Id.*** at 151-52. Rather than retreat, Appellant fired several shots at the victim's legs. ***Id.*** at 154, 156. When the victim continued to approach Appellant, he fired a fatal shot into

the victim's chest. *Id.* at 158. Appellant conceded he did not see the victim with a weapon. *Id.* at 156.

Additionally, Appellant's police statement further revealed that he did not run away when he first felt threatened because he had his firearm and believed people would discover that he fled instead of using it. *Id.* at 238-39. When the Commonwealth further inquired as to why Appellant did not back away down the street to his car after brandishing his firearm, Appellant responded that he "should have, would have, could have" retreated. *Id.* at 264. Therefore, even if Appellant believed force was necessary to protect himself from the victim, he knew he could have avoided any further altercation with the victim by retreating. *See Ventura*, 975 A.2d at 1143.

Moreover, the jury was also aware that Appellant was the victim of several crimes in his past that resulted in significant injuries. *See* N.T. Trial, 1/7/08, at 164-65. The court also instructed the jury on self-defense, as well as imperfect self-defense. N.T. Trial, 1/8/08, at 33-38. Thus, the jury was aware of the various scenarios for which self-defense could apply, but still found Appellant's actions were not justified. *See* 18 Pa.C.S. §§ 505(a), (b)(2)(i)-(ii), 2503(b). Thus, the record supports the PCRA court's determination that even if Appellant's weight of the evidence challenge had been preserved for direct appeal, no relief would have been due because the verdict did not shock the sense of justice. *See* PCRA Ct. Op. at 7; *Houser*, 18 A.3d at 1135-36.

Lastly, to the extent Appellant asserts that there was additional, more detailed evidence regarding his personal history and mental state at the time of the incident, he has failed to develop independent claims that trial counsel was ineffective for failing to investigate or present evidence. Similarly, he has failed to respond to the PCRA court's suggestion that he failed to plead that counsel should have been aware of the evidence contained in the pre-sentence investigative report. **See** PCRA Ct. Op. at 5. Therefore, these claims are waived. **See Commonwealth v. Janda**, 14 A.3d 147, 164 (Pa. Super. 2011). Moreover, because there was ample basis for the jury to find that Appellant violated the duty to retreat, Appellant cannot claim that the additional evidence regarding his mental state at the time of the incident would have altered the jury's deliberation on his claims of self-defense or imperfect self-defense. Accordingly, because the PCRA court's findings are supported by the record and its legal conclusions are free of error, we affirm. **See Miller**, 102 A.3d at 992.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/19/2016

- 20 -